IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SORINA MONTOYA, on behalf of herself
and all others similarly situated,

    Plaintiff,

v.                                        Civil Action No. 3:23cv314

KING.COM LIMITED,
KING DIGITAL ENTERTAINMENT PLC, and
ACTIVISION BLIZZARD, INC.

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANT ACTIVISION BLIZZARD, INC.'S MOTION TO COMPEL MANDATORY ALTERNATIVE DISPUTE RESOLUTION (ECF No. 33), and the supporting, opposing, reply, and supplemental memoranda (ECF Nos. 34, 62, 72, 90, 91, and 92), and DEFENDANTS', KING.COM, LIMITED AND KING DIGITAL ENTERTAINMENT PLC, MOTION TO COMPEL MANDATORY ALTERNATIVE DISPUTE RESOLUTION (ECF No. 48), and the supporting, opposing, reply, and supplemental memoranda (ECF Nos. 49, 65, 77, 90, 91, and 92). For the reasons set forth below, the motions (ECF Nos. 33 and 48) will be granted.

### BACKGROUND

#### I. Factual Background

In March through April of 2023, Plaintiff participated in the Candy Crush All Stars 2023 Tournament ("Tournament"). ECF No. 2 ¶¶ 96-105 ("Compl."). Candy Crush is a popular match-making puzzle

game played on mobile devices. Compl. ¶ 37. The game involves "crushing" candies "by matching three or more of the same candy icons in consecutive order" to clear them from the game board and earn points. Compl. ¶¶ 37-39. At each level, players must accomplish a certain goal in a limited number of moves. Compl. ¶ 38. If players do not accomplish the goal, players lose a "life," and the board resets. Compl. ¶ 39. Players receive five lives to start, and new lives regenerate after a certain amount of time unless the player pays for extra lives. Compl. ¶¶ 40-41.

King.com Limited is the developer of Candy Crush. Compl. ¶¶ 19-21, 31-32. Its affiliate is King Digital Entertainment PLC, and their parent corporation is Activision Blizzard, Inc. (collectively "Defendants"). Compl. ¶¶ 19-21.

In March 2023, Defendants launched the Candy Crush All Stars 2023 Tournament, which allowed Candy Crush players from around the world to compete for a chance to win $250,000 in prizes and an expense-paid trip to London. Compl. ¶ 1. The Tournament consisted of multiple rounds, and participants had to advance to the final round in order to win the top prizes. Compl. ¶¶ 50-53. To help them succeed, participants could purchase in-game boosters and extra lives with real money. Compl. ¶¶ 2, 7.

After spending over $3,000 and close to one-hundred hours on the Tournament, Plaintiff filed a class action complaint against Defendants alleging three counts: (1) violation of the Virginia

2

Consumer Protection Act, Va. Code Ann. § 59.1-200(14), (2) fraud, and (3) unjust enrichment. Compl. ¶¶ 106, 111-145. Plaintiff says that Defendants omitted or actively misrepresented certain information to Tournament participants which caused them to overestimate their chances of success and spend more than they otherwise would have on in-app purchases to boost their competitiveness. Compl. ¶¶ 11, 16. That information included "(1) the number of players advancing through each Tournament stage, (2) that some competitors gain an unfair advantage by cheating, (3) that some competitors have an unfair advantage because they have unlocked game modes that give them enhanced abilities ('Super Users'), and (4) that some users can play offline, which masks their running scores." Compl. ¶ 11.

Defendants argue, <u>inter alia</u>, that Plaintiff agreed to arbitrate those types of claims when she agreed to King's Terms of Use.[1] Defendants say that Plaintiff agreed to King's Terms of Use in two ways: (1) by accepting that she agreed to the Terms of Use before playing Candy Crush, and (2) by agreeing to the Terms of Use when she registered for King's Community Forum.

_____

[1] In Defendants' briefs, the terms are referred to interchangeably as the "Terms of Use" and the "Terms of Service." There appears to be no difference between the two, so the Court will refer to them as the Terms of Use, which is how those terms are titled in the operative documents (ECF Nos. 49-2 and 34-1).

Every Candy Crush player must accept King's Terms of Use before playing Candy Crush for the first time and whenever the Terms of Use are updated. ECF No. 90 at 3-4. When a player first opens the app, a popup dialogue box appears which states, "We've updated our Terms: To continue playing, you need to confirm that you agree to our Terms of Service and have read our Privacy Policy." ECF No. 90 at 3.[2] The Terms of Service and Privacy Policy are hyperlinked below that statement, which is indicated by a blue font color. Id. At the bottom of the dialogue box is a green "Accept" button. Id. A user cannot advance past this dialogue box until affirmatively clicking the green "Accept" button. Id. at 4. King's own records show that Montoya's Candy Crush account clicked the accept button on May 23, 2018, April 12, 2022, and August 28, 2022.[3] ECF No. 90 at 5.

Defendants also determined that Plaintiff agreed to the Terms of Use when she registered for King's Community Forum, which "is a website built for Candy Crush players to get help, connect with other players worldwide, and obtain information." ECF No. 90 at 7

---

[2] Why the phrase in the dialogue box is "Terms of Service" rather than "Terms of Use" is unexplained.

[3] Defendants identified Plaintiff's "Core User Identification Numbers" associated with her Candy Crush account and located in their data the records associated with those Core User IDs documenting each acceptance of the Terms of Use in the Candy Crush application and the exact times when those acceptances occurred. ECF No. 90 at 4-6.

(quoting ECF No. 42-1 ¶ 28). The process of signing up for the Community Forum is separate and distinct from the process described above. To sign up for the Community Forum, players must agree to King's Terms of Use and its Privacy Policy by checking a box that says, "I have read and agree to the Terms of Use and Privacy Policy" and then clicking a green button that says, "Sign Up." ECF No. 90 at 8. The words Terms of Use and Privacy Policy appear in green font and are hyperlinked to the applicable terms and policies. Id. Defendants identified Plaintiff's Community Forum profile in their records and determined that she checked the box agreeing to the Terms of Use and clicked "Sign Up" on April 21, 2023, which was during the time Plaintiff claims she was playing in the Tournament. Id. at 10.

King's Terms of Use include a binding arbitration clause which states:

> 21.3 Binding Arbitration: If the parties do not reach an agreed upon solution within a period of 30 days from the time informal dispute resolution is pursued pursuant to the paragraph 21.2, then You and King agree that all Disputes shall be resolved by binding arbitration according to this agreement. ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JUDGE OR JURY IN A COURT PROCEEDING AND YOUR GROUNDS FOR APPEAL ARE LIMITED. Under this agreement, binding arbitration shall be administered by JAMS, a nationally recognized arbitration authority, under its procedures then in effect for consumer related disputes, but excluding any rules that permit joinder or class actions in arbitration (for more detail on procedure, see paragraph 21.5 below). You and King understand and agree that (a) the Federal Arbitration Act (9 U.S.C. §1, et seq.) governs the interpretation and enforcement of this paragraph 21, (b) this agreement

5

> memorialises a transaction in interstate commerce, and
> (c) this paragraph 21 shall survive termination of this
> agreement.

ECF No. 34-1 ¶ 21.3. This arbitration provision applies to "all Disputes between [the user] and King and/or King's parents, subsidiaries and Affiliates relating to the Games and Services." Id. ¶ 21.1. Affiliate is defined as "any entity controlling, controlled by or under common control with King, where 'control' means the direct or indirect ownership of more than fifty percent (50%) of such entity's capital or equivalent voting rights." Id. There is no dispute that King Digital and Activision are both affiliates of King. Dispute broadly includes:

> any dispute, claim, controversy or action between [the
> user] and King (or any King Affiliates) arising out of
> or relating to this agreement, the Services, or any other
> transaction involving [the user] and King, whether in
> contract, warranty, misrepresentation, fraud, tort,
> intentional tort, statute, regulation, ordinance, or any
> other legal or equitable basis.

Id. Services include the "download, access and/or use of King games" as well as "customer support, social media, community channels and other websites that [King] operate[s] from time to time . . . ." Id. ¶ 1.1.

Importantly, the arbitration agreement includes a delegation clause which states, "[t]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation,

applicability, enforceability or formation[4] of this Agreement . . . ." Id. ¶ 21.4. The arbitration provision also incorporates JAMS Rules, which similarly provide that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought . . . shall be submitted to and ruled on by the Arbitrator." ECF No. 92 at 8 (quoting JAMS Rule 8(b)).

In addition to King's Terms of Use, King created a separate set of Tournament Rules to govern Tournament play and activities. ECF No. 34-2. These rules cover "player eligibility, Tournament structure, prize awards, and player conduct." Id. ¶ 1.2. The Tournament Rules "are in addition to and incorporate King's Terms of Use . . . ." Id. ¶ 2.3. However, "[i]n the event of a conflict," the Tournament Rules "shall govern." Id. ¶ 2.4. Unlike, the Terms of Use, the Tournament Rules do not include an arbitration clause. Instead, they require that "disputes arising out of or in connection with [the] competition . . . be adjudicated in the courts of England." Id. ¶ 11.3.

---

[4] "Formation" of an arbitration agreement entails a determination whether the Plaintiff assented to the agreement, and that is a matter for the courts, not the arbitrator, to decide. See Berkeley County School District v. Hub International Limited, 944 F.3d 225, 234 (4th Cir. 2019). This question is not an issue in this case. See ECF No. 91 at 7.

Plaintiff originally argued that Defendants failed to establish that Plaintiff ever assented to either the Tournament Rules or the Terms of Use, so she cannot be compelled to arbitrate her claims. ECF No. 65 at 1; ECF No. 62 at 1. Now, in her supplemental brief, Plaintiff no longer disputes that she agreed to King's Terms of Use. See ECF No. 91 at 7 ("In the course of [] discovery, Defendants offered evidence that Plaintiff agreed to the Terms of Use by clicking the 'Accept' button."). Plaintiff's remaining argument is that the Tournament Rules, which do not require arbitration, take precedence over the Terms of Use, which do require arbitration. Id. at 9-16. In other words, Plaintiff did not agree to arbitrate these particular claims concerning the Tournament because the arbitration provision in the Terms of Use does not cover them.

Defendants respond that (1) Plaintiff agreed to arbitrate her claims, including any disputes about the applicability of the arbitration clause, when she accepted King's Terms of Use; (2) the Tournament Rules cannot supersede Plaintiff's agreement to arbitrate because there was no mutual assent to change or alter that pre-existing obligation to arbitrate; and (3) even if the Tournament Rules did govern Plaintiff's claims, no conflict between the Tournament Rules and Terms of Use exists because the Tournament Rules' requirement to resolve disputes in the courts of England, rather than through arbitration, applies only to non-U.S.

participants to whom the pre-existing arbitration clause did not already apply. ECF No. 92 at 1-2.

## II. Procedural Background

Plaintiff filed her Complaint on May 9, 2023. Compl. On August 1, 2023, Activision Blizzard Inc. filed a motion to compel mandatory alternative dispute resolution (ECF No. 33), a motion to dismiss for lack of personal jurisdiction (ECF No. 35), a motion to dismiss for improper venue (ECF No. 37), a motion to transfer the case (ECF No. 39), and a motion to dismiss claims for declaratory and injunctive relief (ECF No. 41). On August 15, 2023, King and King Digital also filed a motion to compel mandatory alternative dispute resolution (ECF No. 48), a motion to dismiss for lack of personal jurisdiction (ECF No. 50), a motion to dismiss for improper venue (ECF No. 52), a motion to transfer the case (ECF No. 54), and a motion to dismiss claims for declaratory and injunctive relief (ECF No. 56).

On September 19, 2023, the Court held a telephonic conference with the parties and decided to resolve the motions to compel mandatory alternative dispute resolution first. ECF No. 85.[5] The

---

[5] The Court has discretion "to choose among threshold grounds for denying audience to a case on the merits." Sinochem Int'l. Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999)); see also Amadasun v. Google, Inc., 2022 WL 2829644, at *1 (N.D. Ga. July 19, 2022)(deciding the issue of arbitrability before issues of subject-matter jurisdiction); Burch v. 1412 Lansdowne Operating, LLC, 2021 WL 4443768, at *3 (E.D.N.Y. Sep. 29, 2021)

parties were permitted to conduct discovery and to submit supplemental briefings on that issue. ECF No. 89. Additional proceedings and discovery were stayed pending resolution of those motions. Id. Defendants submitted their supplemental brief on December 1, 2023 (ECF No. 90), Plaintiff filed her response on December 15, 2023 (ECF No. 91), and Defendants filed their reply on December 22, 2023 (ECF No. 92).

## DISCUSSION

### I. Legal Standard

Arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When a party is "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration," section 4 of the Federal Arbitration Act (FAA) allows that party to "petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

Before ordering arbitration, the court must be "satisfied that the making of the agreement for arbitration or the failure to

---

("A court may resolve a motion to compel arbitration before addressing a motion to dismiss based on lack of personal jurisdiction or forum non conveniens.")(citing Sinochem, 549 U.S. at 431).

10

comply therewith is not in issue." Id. The standard is akin to that of summary judgment. See Berkeley County School District v. Hub International Limited, 944 F.3d 225, 234 (4th Cir. 2019). If there is no genuine dispute of material fact regarding the formation of an agreement to arbitrate, then the court may order arbitration. Id. However, if the party "unequivocally denies 'that an arbitration agreement exits,' and 'show[s] sufficient facts in support' thereof[,]" the "court shall proceed summarily" to trial on the motion to compel arbitration. Id. (quoting Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc., 807 F.3d 553, 564 (4th Cir. 2015); 9 U.S.C. § 4).

Ultimately, the Court must determine whether "(i) the parties have entered into a valid agreement to arbitrate, and (ii) [whether] the dispute in question falls within the scope of the arbitration agreement." Chorley, 807 F.3d at 563. If there is a valid agreement to arbitrate, and the dispute falls within the scope of that agreement, the court shall compel arbitration. Id.

In some cases, however, the arbitration agreement may grant the arbitrator, rather than the court, the exclusive authority to decide threshold issues of arbitrability, such as whether the arbitration agreement covers a particular dispute. Such agreements are valid and enforceable, but the delegation clause must "clearly and unmistakably" delegate that authority to the arbitrator. See Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 69 n.1, 70

(2010); <u>Peabody Holding Co., LLC v. United Mine Workers of Am.,
Int'l Union</u>, 665 F.3d 96, 102 (4th Cir. 2012) (explaining that the
"clear and unmistakable" test is a higher standard for determining
whether the parties intended to arbitrate arbitrability). "[W]hen
an agreement 'clearly and unmistakably' delegates the threshold
issue of arbitrability to the arbitrator, a court must enforce
that delegation clause and send that question to arbitration."
<u>Gibbs v. Haynes Invs., LLC</u>, 967 F.3d 332, 337 (4th Cir.
2020)(quoting <u>Rent-A-Center</u>, 561 U.S. at 67)). Put another way,
"if a valid [arbitration] agreement exists, and if the agreement
delegates the arbitrability issue to an arbitrator, a court may
not decide the arbitrability issue." <u>Henry Schein, Inc. v. Archer
and White Sales, Inc.</u>, 586 U.S. 63, 69 (2019).

### II. The Parties Formed a Valid Arbitration Agreement

After discovery and supplemental briefing, neither party
disputes that Plaintiff agreed to King's Terms of Use. ECF No. 91
at 7-8; ECF No. 92 at 2. Defendants' internal records affirmatively
demonstrate that Plaintiff agreed to King's Terms of Use in two
ways: (1) by clicking an "accept" button signifying her agreement
to King's hyperlinked Terms of Use in a popup dialogue box on her
Candy Crush app on May 23, 2018, April 12, 2022, and August 28,
2022, and (2) by clicking a check-box affirming that she read and
agreed to King's hyperlinked Terms of Use when she registered for

King's Community Forum website on April 21, 2023. ECF No. 90 at 2-11.

These methods of acceptance are known as clickwrap agreements. A clickwrap agreement can be defined as an agreement where a party must digitally check a box or click a button to acknowledge that the party agrees to certain terms and conditions before using a service. See American Eagle Motors, LLC v. Copart of Connecticut, Inc., 2023 WL 123503, at *3 (E.D. Va. Jan. 5, 2023). Courts have routinely found these types of clickwrap agreements, including arbitration agreements, to be enforceable. Id.; Hosseini v. Upstart Network, Inc., 2020 WL 573126, at *4, n.4 (E.D. Va. Feb. 5, 2020) (collecting cases); Melo v. Zumper, Inc., 439 F. Supp. 3d 683, 697 (E.D. Va. 2020). The key inquiry is whether the clickwrap design provides the user with "actual or constructive knowledge of the site's terms and conditions" and "reasonable notice that a click will manifest assent" to those terms and conditions. Melo, 439 F. Supp 3d at 697 (internal quotations omitted); Meyer v. Uber Technologies, Inc., 868 F.3d 66, 75 (2nd Cir. 2017) (quoting Sgouros v. TransUnion Corp., 817 F.3d 1029, 1033-34 (7th Cir. 2016)).

Here, both types of acceptances of King's Terms of Use are enforceable clickwrap agreements. See American Eagle Motors, 2023 WL 123503, at *3 (holding that a similar clickwrap agreement is

enforceable); <u>Hosseini</u>, 2020 WL 573126, at *5 (same).[6] The in-app dialogue box informed Plaintiff that she must "confirm that [she] agree[s] to [King's] Terms of Service" to continue playing and provided a hyperlink to those terms indicated by a blue font color. ECF No. 90 at 3. Plaintiff had to manifest assent to those terms by affirmatively clicking a green "Accept" button. <u>Id.</u> Similarly, King's Community Forum signup page required Plaintiff to affirmatively check a box acknowledging that "I have read and agree to the Terms of Use and Privacy Policy." <u>Id.</u> at 9. The Terms of Use and Privacy Policy were hyperlinked, which was indicated by a green font color. <u>Id.</u> The language and layout in both formats gave Plaintiff reasonable notice that clicking the button or checking the box manifests assent to King's Terms of Use. And the Terms of Use were conspicuously hyperlinked to give Plaintiff constructive notice of the terms to which she was agreeing. <u>See</u> <u>Melo</u>, 439 F. Supp. 3d at 697. Even if Plaintiff did not elect to read the terms, her manifestation of assent still forms a binding contract in this case. <u>See, e.g.</u>, <u>Chesapeake Builders, Inc. v. Lee</u>, 492 S.E.2d 141, 145 (Va. 1997); <u>Sydnor v. Conseco Financial Servicing Corp.</u>, 252

---

[6] Unlike in <u>Sgouros v. TransUnion Corp.</u>, 817 F.3d 1029 (7th Cir. 2016) and <u>Austin v. Equifax Information Services, LLC</u>, 2023 WL 8646275 (E.D. Va. Dec. 14, 2023), this case does not involve deceptive clickwraps that foreclosed any finding of assent by the consumer-plaintiff.

F.3d 302, 306 (4th Cir. 2001); <u>Melo</u>, 439 F. Supp. 3d at 698. Thus, these clickwrap agreements to arbitrate are valid and enforceable.

King updated its Terms of Use no later than November 11, 2020, and they remained in effect until November 2023. ECF No. 90 at 17. Therefore, finding no genuine dispute of any material fact, the Court holds that Plaintiff did agree to that version of King's Terms of Use (provided in ECF Nos. 34-1 and 49-2), and in doing so, formed a valid agreement to arbitrate.

The Court also finds that Plaintiff agreed to the delegation clause in the arbitration agreement and holds that the delegation provision is valid. Plaintiff did not make any challenge to the enforceability or validity of the delegation provision. When a litigant fails to "challenge[] the delegation provision specifically," courts "must treat it as valid." <u>Rent-A-Center</u>, 561 U.S. at 72.

## III. The Arbitration Agreement Includes a Clear and Unmistakable Delegation Clause

If a valid arbitration agreement exists, the next question is whether the parties' dispute "falls within the scope of the arbitration agreement." <u>Chorley</u>, 807 F.3d at 563. Usually, the Court decides that issue, but in some cases, the parties may agree to let the arbitrator decide such threshold questions of arbitrability. Such agreements are valid and enforceable. <u>Rent-A-Center</u>, 561 U.S. at 68-70. "When the parties' contract delegates

the arbitrability question to an arbitrator . . . a court possesses no power to decide the arbitrability issue." Henry Schein, 586 U.S. at 68. Instead, the court should send the arbitrability question to arbitration. Gibbs, 967 F.3d at 337.

However, "courts 'should not [simply] assume that the parties agreed to arbitrate arbitrability . . . .'" Henry Schein, 586 U.S. at 72 (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). If the parties intend to "delegate threshold arbitrability questions to the arbitrator," they must do so by "'clear and unmistakable' evidence." Id. at 69 (quoting First Options, 514 U.S. at 944). The Fourth Circuit has held that this "standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice." Peabody, 665 F.3d at 102. Therefore, a proper delegation clause should state something to the effect of "'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration.'" Id. (quoting Carson v. Giant Food, Inc., 175 F.3d 325, 330-31 (4th Cir. 1999)).

Defendants say that the parties clearly and unmistakably agreed to arbitrate issues of arbitrability for two reasons. First, the Terms of Use state: "The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement,

16

including any claim that all or any part of this agreement is void or voidable." ECF No. 34-1 ¶ 21.4. Defendants say that this delegation provision granting the arbitrator "exclusive authority" to resolve disputes involving the "interpretation, applicability, enforceability, or formation" of the Agreement clearly and unmistakably vests the arbitrator with the authority to decide any threshold arbitrability questions. ECF No. 92 at 7-8. Second, the Terms of Use require arbitration to be administered under JAMS' rules and procedures. ECF No. 34-1 ¶¶ 21.3, 21.4. JAMS Rules provide that "arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought . . . shall be submitted to and ruled on by the Arbitrator." ECF No. 92 at 8 (quoting JAMS Rule 8(b), https://www.jamsadr.com/rules-streamlined-arbitraiton). According to Defendants, the express incorporation of JAMS Rules, which include a clear delegation provision, into the Terms of Use clearly and unmistakably demonstrates that the parties intended to arbitrate issues of arbitrability. ECF No. 92 at 9.

The Fourth Circuit has held that the incorporation of JAMS Rules into an arbitration agreement "serves as 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability." Simply Wireless, Inc. v. T-Mobile US, Inc., 877 F.3d 522, 528 (4th Cir. 2017), abrogated on other grounds, Henry

Schein, 586 U.S. at 68. However, the Court limited its holding to "the context of a commercial contract between sophisticated parties." Id. Montoya is certainly not a sophisticated party. She was a consumer who signed a clickwrap agreement with a large corporation in order to play a mobile game. Therefore, with the Fourth Circuit's limitation in mind, the incorporation of JAMS' rules and procedures into the Terms of Use does not serve as clear and unmistakable evidence of the parties' intent to arbitrate arbitrability in this particular context.

Nonetheless, the language of the express delegation clause in the Terms of Use does clearly and unmistakably delegate to the arbitrator the exclusive authority to decide certain arbitrability issues. In Novic v. Credit One Bank, Nat'l Ass'n, the Fourth Circuit addressed whether a delegation clause contained language that "specifically and plainly reflect[ed] the parties' intent to delegate disputes regarding arbitrability to an arbitrator." 757 F. App'x 263, 266 (4th Cir. 2019). The delegation clause at issue stated that "[c]laims subject to arbitration include . . . the application, enforceability or interpretation of [the cardholder agreement], including this arbitration provision." Id. at 266. The Court of Appeals found that this language "is similar in crucial respects to the language of the delegation clause at issue

in Rent-A-Center," id., [7] and then held that both delegation clauses would "unambiguously require arbitration of any issues concerning the 'enforceability' of the arbitration provisions." Id.[8]

---

[7] The delegation clauses in Novic and Rent-A-Center are slightly different. In Novic, the clause specifically delegates disputes over the arbitration provision to the arbitrator. 757 Fed. App'x. at 264 ("[c]laims subject to arbitration include, but are not limited to, disputes relating to ... the application, enforceability or interpretation of this Agreement, including this arbitration provision.")(emphasis added). Contrastingly, in Rent-A-Center, the delegation clause does not specifically mention the arbitration agreement, only the agreement generally. 561 U.S. at 66 (giving the arbitrator "exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement")(emphasis added). Novic indicates that that distinction is not dispositive and distinguishes the language in these delegation clauses from the "broad wording of general arbitration provisions" that have been previously rejected as not satisfying the "clear and unmistakable" standard. 757 Fed. App'x at 266 (citing Peabody, 665 F.3d at 103; Carson, 175 F.3d at 329). Those broadly worded provisions generally provide for arbitration of "any dispute" or "any interpretive dispute" regarding the entire Agreement and do not specifically reference arbitrability issues such as enforceability or applicability as is the case here. See Peabody, 665 F.3d at 102-03 (collecting cases).

[8] In Rent-A-Center, the Supreme Court did not address whether the delegation provision at issue would satisfy the "clear and unmistakable" test because the parties had not disputed that issue. 561 U.S. at 69 n.1. Instead, the Court addressed whether the arbitration agreement was valid, which the Court noted is a different analysis than the clear and unmistakable test. Id. The district court did, however, find that the "Agreement to Arbitrate clearly and unmistakenly [sic] provides the arbitrator with the exclusive authority to decide whether the Agreement to Arbitrate is enforceable." Id.

The delegation clause in this case is substantially identical to the one at issue in Rent-A-Center.[9] Therefore, the Terms of Use would likewise unambiguously require arbitration of any disputes concerning the "applicability" of the arbitration provisions. This is consistent with the holdings of courts in other circuits which have addressed nearly identical delegation provisions. See, e.g., Garcia v. Family Dollar Stores of Texas, LLC, 2018 WL 6220135, at *4 (W.D. Tex. May 9, 2018)(holding that the delegation clause "clearly demonstrates that the Parties agreed that the issue of arbitrability is for the arbitrator"); Gomez v. Rent-A-Center, Inc., 2018 WL 3377172 (D.N.J. July 10, 2018)(holding that the delegation provision "is a clear statement that the parties agreed to arbitrate all issues, including whether the Arbitration Agreement itself is enforceable.").

Thus, Plaintiff's dispute must be arbitrated. Plaintiff's core argument to the contrary is that the Tournament Rules

---

[9] The full delegation clause states, "The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." See Rent-A-Center, 561 U.S. at 66. The delegation clause in the Terms of Use states, "[t]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement, including any claim that all or any part of this agreement is void or voidable." ECF No. 34-1 ¶ 21.4

supersede King's Terms of Use, and because the Tournament Rules do not include an arbitration requirement, Plaintiff should not be required to arbitrate her claims. ECF No. 91 at 1-2. Whether the Tournament Rules or the Terms of Use cover Plaintiff's claims is a dispute over applicability that the arbitrator, not the Court, must decide. Gibbs, 967 F.3d at 337 (quoting Rent-A-Center, 561 U.S. at 67) ("[W]hen an agreement 'clearly and unmistakably' delegates the threshold issue of arbitrability to the arbitrator, a court must enforce that delegation clause and send that question to arbitration."). Thus, the arbitrator shall decide which terms govern Plaintiff's claims, and if the Terms of Use do apply, whether the claims fall within the scope of the arbitration agreement.

## CONCLUSION

For the foregoing reasons, the Court holds that Plaintiff did agree to King's Terms of Use and the arbitration agreement therein. The Court also holds that the arbitration agreement includes a valid delegation clause which clearly and unmistakably gives the arbitrator exclusive authority to decide whether the Terms of Use, and its arbitration provision, apply to a particular dispute. Whether Plaintiff's claims fall under the Terms of Use or the Tournament Rules is a question of applicability Plaintiff has agreed to arbitrate.

Thus, pursuant to the FAA, the parties' dispute must proceed to arbitration, and the arbitrator shall consider whether Plaintiff's claims are covered by the arbitration agreement in the Terms of Use. 9 U.S.C. § 4. Accordingly, DEFENDANT ACTIVISION BLIZZARD, INC.'S MOTION TO COMPEL MANDATORY ALTERNATIVE DISPUTE RESOLUTION (ECF No. 33) and DEFENDANTS', KING.COM, LIMITED AND KING DIGITAL ENTERTAINMENT PLC, MOTION TO COMPEL MANDATORY ALTERNATIVE DISPUTE RESOLUTION (ECF No. 48) will be granted.

It is so ORDERED.

_____ /s/   _____

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  April 18, 2024